# United States Court of Appeals
## For the First Circuit

No. 01-2032

EDWARD A. WOJCIK and DEBRA WOJCIK,

Plaintiffs, Appellants,

v.

MASSACHUSETTS STATE LOTTERY COMMISSION; SHANNON P. O'BRIEN,
individually and in her official capacity; JAY MITCHELL,
individually and in his official capacity; and DWIGHT ROBSON,
individually and in his official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,

Campbell and Cyr, Senior Circuit Judges.

Philip N. Beauregard, with whom Michael Franco and Beauregard,
Burke & Franco were on brief, for appellants.
Salvatore M. Giorlandino, Assistant Attorney General, with
whom Thomas F. Riley, Attorney General of Massachusetts, and Maria
Hickey Jacobson, Assistant Attorney General, were on brief, for
appellees.

August 20, 2002

**TORRUELLA**, **Circuit Judge**. Appellant Edward Wojcik ("Wojcik") and his wife, Debra, brought suit against the Massachusetts State Lottery Commission ("Lottery Commission") and a handful of Lottery Commission officials for damages arising out of Wojcik's termination as a Lottery Commission employee. After dismissing the claims against one defendant on Eleventh Amendment grounds, the district court granted the remaining defendants' motion for summary judgment on all of the claims under federal law.[1] The leftover state-law claims were dismissed without prejudice. On appeal, Wojcik claims error in the district court's Eleventh Amendment and summary judgment rulings. Finding none, we affirm.

## I.

## A.

We recite the facts in the light most favorable to appellant, drawing all reasonable inferences in his favor. See McIntosh v. Antonio, 71 F.3d 29, 33 (1st Cir. 1995).

Wojcik was hired by the Lottery Commission in 1976. In 1999, he held the position of Field Service Manager in the Lottery Commission's office in Fairhaven, Massachusetts. His employment

---

[1] The district court granted summary judgment on Debra Wojcik's federal claims on the ground that they were essentially premised on a loss of consortium. See Tauriac v. Polaroid Corp., 716 F. Supp. 672, 673 (D. Mass. 1989) ("The spouse of an alleged federal civil rights victim is not permitted an ancillary cause of action for loss of consortium"). On appeal, there appears to be no challenge to the district court's decision in this regard. We therefore assume that only Edward Wojcik's federal claims are at issue on appeal.

history with the Lottery Commission was largely uneventful until August 30, 1999. On that day, he was confronted in the Fairhaven office by the Lottery Commission's General Counsel, Internal Auditor, and Chief Investigator. These officials were accompanied by a Massachusetts state police officer.

Wojcik was interrogated concerning allegations that he had been playing scratch tickets in violation of a Massachusetts law that prohibits "any member or employee of the [Lottery] commission or . . . any spouse, child, brother, sister or parent residing as a member of the same household in the principal place of abode of any member or employee of the commission" from purchasing a Massachusetts lottery ticket or a share of a ticket, and from being paid any prize from a lottery ticket. Mass. Gen. Laws ch. 10, § 31.

Wojcik was also interrogated concerning his possible knowledge of eleven books of scratch tickets that had recently been discovered missing from the Fairhaven office. At the end of the interrogation, the officials informed Wojcik that he was suspended without pay.

At the time of these events, the Lottery Commission was the object of intense media scrutiny caused by allegations of theft and embezzlement by Lottery Commission employees. The media also picked up on the story of the missing scratch tickets in the Fairhaven office and linked the story to the recent suspension of Wojcik and two other employees in the same office. Articles appeared in the Boston Globe, Boston Herald, New Bedford Standard

<u>Times</u>, and <u>Brockton Enterprise</u>. The Lottery Commission's stated position in the articles was that Wojcik and the others were under investigation for "violation of Lottery policies and procedures and applicable statutory provisions."

Wojcik was a member of the Service Employees International Union, Local 254 ("Union" or "Local 254"), which had a collective-bargaining agreement with the Lottery Commission. Under that agreement, employees could not be terminated "without just cause." According to Wojcik, immediately following his suspension, Local 254 contacted the Lottery Commission on Wojcik's behalf, requesting specifics of the allegations against him, but the Lottery Commission provided no details, such as dates, places, and witness names.

On September 20, 1999, Wojcik received a letter of termination, signed by the Executive Director of the Lottery Commission, appellee Jay Mitchell. The letter states that Wojcik was terminated for "violation of Lottery policies and procedures and applicable statutory provisions."

Again, publicity appeared in the news media. In particular, the <u>Boston Globe</u> and <u>Boston Herald</u> both reported that two Lottery Commission employees had been terminated and another had resigned under suspicion of stealing winning scratch tickets. The Lottery Commission's official stance remained that Wojcik was terminated "for failing to meet standards and for violating lottery policies and procedures."

-4-

Shortly after his termination, Wojcik filed a grievance through the Union to contest his termination and obtain a hearing on the allegations against him. After several months, during which Wojcik claims that the Lottery Commission failed to give him specific notice of the allegations against him, the Lottery Commission finally denied the grievance. Wojcik then filed for arbitration, as provided in the collective-bargaining agreement.

The arbitration hearings began on August 9, 2000, and continued on a scattered basis for several months. At the hearing, Wojcik had personal counsel representing him. The arbitration addressed only whether the Lottery had "just cause" under the collective-bargaining agreement to terminate Wojcik for playing lottery tickets; it did not address whether he had engaged in the theft. However, it is now undisputed that Wojcik did not steal lottery tickets and that he was not connected to the eleven missing books of scratch tickets. The arbitration proceedings were not open to the public.

On May 23, 2001, twenty-one months after the suspension, the arbitrator issued his decision. The arbitrator upheld the discharge, concluding that Wojcik had played scratch tickets in violation of both state law and an agreement he signed at the beginning of his employment with the Lottery Commission. In particular, the arbitrator credited the testimony of a Lottery Commission security officer and an administrative assistant from the Fairhaven office establishing that Wojcik and others played lottery scratch tickets on a frequent basis. The arbitrator

concluded that Wojcik and others "chased books of tickets," meaning that they kept purchasing tickets from a particular book until one of them won a prize or until they were told that another person had won a large prize from a ticket in that book. The arbitrator also found that Wojcik once hit a large prize and had his mother-in-law cash the ticket on his behalf. Finally, although Wojcik ultimately admitted to his wrongdoing, the arbitrator concluded that he had engaged in dishonesty by initially denying that he violated the prohibition on playing lottery tickets.

Wojcik did not seek review of the arbitrator's decision. See Mass. Gen. Laws ch. 150C, § 11 (providing grounds for vacatur of arbitrator's award).

**B.**

Edward Wojcik and his wife filed the instant action in district court on June 30, 2000. They named as defendants the Lottery Commission; appellee Shannon O'Brien, the Massachusetts State Treasurer and Chairman of the Lottery Commission; Mitchell; and appellee Dwight Robson, a spokesperson for the Lottery Commission. The amended complaint contained claims for violation of 42 U.S.C. § 1983; violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I; defamation; tortious interference with contractual relations; invasion of privacy; and loss of consortium.

On February 23, 2001, the district court dismissed all claims against the Lottery Commission as barred by the Eleventh Amendment. Later, the district court also dismissed all claims

asserted against the remaining defendants in their official capacities.

Shortly after the arbitrator rendered his decision, the remaining defendants moved for summary judgment on all claims. On June 27, 2001, the district court, in a ruling from the bench, granted the motion for summary judgment as to the § 1983 claims. Exercising its discretion under 28 U.S.C. § 1367(c), the district court also dismissed the remaining state-law claims without prejudice, giving Wojcik and his wife an opportunity to refile these claims in Massachusetts Superior Court. Although they did not avail themselves of this opportunity, a timely appeal to this Court followed.

## II.

Wojcik seeks review of several of the district court's rulings. He asserts error in the district court's conclusion that the Lottery Commission is immune from suit under the Eleventh Amendment. He also challenges the district court's grant of summary judgment with respect to each of his three claims of a constitutional violation.

## A.

The standard of review is not in dispute. Whether the district court correctly applied the immunity doctrine under the Eleventh Amendment is a question of law that engenders de novo review on appeal. Arecibo Cmty. Health Care, Inc. v. Puerto Rico, 270 F.3d 17, 22 (1st Cir. 2001).

Likewise, we review the district court's ruling on summary judgment de novo. Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). The record evidence must be construed "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

**B.**

As a general matter, "states are immune under the Eleventh Amendment from private suit in the federal courts, absent their consent." Greenless v. Almond, 277 F.3d 601, 606 (1st Cir. 2002). This immunity extends to any entity that is an "arm of the state." In re San Juan Dupont Plaza Hotel Fire Litig., 888 F.2d 940, 942 (lst Cir. 1989); see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (holding that an "arm of the state" partakes of the state's sovereign immunity, but that such immunity does not extend to municipal corporations or other political subdivisions). Before moving to the merits of Wojcik's federal claims, we address the threshold question of whether the Lottery Commission is an "arm of the state" and therefore immune from Wojcik's suit in federal court.

To determine whether an entity is an "arm of the state" entitled to immunity, we apply a multi-factor analysis comprised of the following inquiries:

> (1) whether the agency has the funding power to enable it to satisfy judgments without direct state participation or guarantees; (2) whether the agency's function is governmental or proprietary; (3) whether the agency is separately incorporated; (4) whether the state exerts control over the agency, and if so, to what extent; (5) whether the agency has the power to sue, be sued, and enter contracts in its own name and right; (6) whether the agency's property is subject to state taxation; and (7) whether the state has immunized itself from responsibility for the agency's acts or omissions.

Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth., 991 F.2d 935, 939-40 (1st Cir. 1993). The entity asserting its immunity bears the burden of showing that it is an arm of the state. Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir. 2002).

With respect to its ability to satisfy a judgment, see Metcalf & Eddy, 991 F.2d at 939, the Lottery Commission points to the fact that its budget must be approved and appropriated by the legislature on an annual basis. See Mass. Gen. Laws ch. 10, § 25. The start-up budget disbursement is then paid back to the general fisc as the Lottery makes money during the year. The Lottery Commission does not have the power to issue bonds to raise revenue for its operations. Thus, any unanticipated expenditures or judgments against the Lottery Commission must be paid out of its appropriated annual budget, and any need for spending above the appropriated amount would require an additional appropriation from the legislature and approval from the governor. This demonstrates

the Lottery Commission's limited ability to satisfy a judgment without drawing upon the state's fisc.

As for whether the Lottery Commission's "function[s] [are] governmental or proprietary," Metcalf & Eddy, 991 F.2d at 939, we think that this factor also favors recognizing immunity. The Lottery Commission is responsible under state law for "conduct[ing] a state lottery" and establishing a fund consisting "of all revenues received from the sale of lottery tickets . . . [i]n order to provide local property tax relief [to Massachusetts municipalities] and continue services at the local level." Mass. Gen. Laws ch. 10, §§ 24, 35. This revenue-raising function is decidedly governmental in nature. Cf. Bretton v. State Lottery Comm'n, 673 N.E.2d 76, 79 (Mass. App. Ct. 1996) ("The [Lottery Commission's] activities . . . are driven by legislative mandate, not business or personal objectives," and "[its] activities hardly resemble endeavors conducted in a conventional business context.").

The Lottery Commission exercises certain ancillary powers that also support this conclusion. For instance, the Lottery Commission has quasi-judicial powers to resolve disputes involving "any matter over which it has jurisdiction, control or supervision," Mass. Gen. Laws ch. 10, § 24, and its decisions in such disputes are subject to judicial review by the state courts pursuant to the Massachusetts Administrative Procedure Act, Mass. Gen. Laws ch. 30A, § 14. See Bretton, 673 N.E.2d at 80. We therefore conclude that the Lottery Commission's operations are more governmental than proprietary in nature.

It is also clear under Massachusetts law that the Lottery Commission "is [not] separately incorporated." Metcalf & Eddy, 991 F.2d at 940. Instead, the Lottery Commission was established as a division of the Massachusetts Treasury Department. See Mass. Gen. Laws ch. 10, § 23. The State Treasurer, an elected official, is required by law to serve as the chairman of the Lottery Commission, and the remaining board members consist of the Secretary of Public Safety or his designee, the State Comptroller or his designee, and two persons appointed by the Governor. See id.

Furthermore, the structure of the Lottery Commission reflects the significant degree of control the state retains over its operations. See Metcalf & Eddy, 991 F.2d at 940. As noted above, the annual budget for the Lottery must be approved by legislative action, and the Lottery Commission's governing officials are either elected by the public or appointed by the Governor. In addition, the State Treasurer's authority to appoint a director of the Lottery Commission is subject to the approval of the governor. See Mass. Gen. Laws ch. 10, § 26.

The Lottery Commission's ability to enter into contracts is limited. See Metcalf & Eddy, 991 F.2d at 940. It does not have the power to lease real property in its own name; instead, the state leases such property through its Department of Capital Asset Management, an agency within the Governor's Executive Office of Administration and Finance.

Lastly, we detect nothing in Massachusetts law evincing the state's intention to immunize itself from responsibility for the Lottery Commission's acts or omissions. See id.

Viewed in their totality, the relevant factors clearly point in the direction of recognizing the Lottery Commission as an "arm of the state" entitled to immunity under the Eleventh Amendment.[2] Appellant, however, disputes this conclusion by relying on a district court case which held that, under Rhode Island law, the Rhode Island Lottery Commission is not an "arm of the state" entitled to sovereign immunity. R.I. ACLU v. R.I. Lottery Comm'n, 553 F. Supp. 752, 763-66 (D.R.I. 1982). As appellant notes, we have cited this opinion with approval as recently as last year. See Hawkins v. R.I. Lottery Comm'n, 238 F.3d 112, 116 (1st Cir. 2001). Nonetheless, we do not view the Rhode Island case as controlling.

We are obviously not bound by the decisions of our lower courts. See Calaf v. González, 127 F.2d 934, 938 (1st Cir. 1942); see also In re Executive Office of President, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district." (citations and quotation marks omitted)). And on the issues before us, the Eleventh Amendment demands a case-by-case inquiry into the specific structure and functions of the public

_____

[2]    The appellees offer no evidence either way as to the tax treatment of the Lottery Commission's property. See Metcalf & Eddy, 991 F.2d at 940. This factor therefore plays no role in our calculus.

entity in question. Gross generalizations about entities performing similar functions in different states are not helpful. Compare R.I. ACLU, 553 F. Supp. at 763-66 (holding that the Rhode Island Lottery Commission is not an "arm of the state"), with Jeffries v. Celeste, 654 F. Supp. 305, 307 (S.D. Ohio. 1986) (holding that officials of the Ohio Lottery Commission were immune from damages in their official capacities), Malone v. Schenk, 638 F. Supp. 423, (C.D. Ill. 1985) (holding that the Illinois Lottery Division partakes of the state's Eleventh Amendment immunity), and Ruman v. Pa. Dep't of Rev., 462 F. Supp. 1355 (M.D. Pa.) (same with regard to the Pennsylvania Bureau of State Lotteries), aff'd, 612 F.2d 574 (3d Cir. 1979).

Regardless of whether the Rhode Island decision is correct on its own facts, it is clearly distinguishable from the case at hand. There, the court held that the Rhode Island Lottery Commission "is fiscally and operationally autonomous from the State of Rhode Island." R.I. ACLU, 553 F. Supp. at 765. In particular, the court determined that the Rhode Island Lottery Commission "is essentially run like a private business," in that it "sets its own budget, has complete control over its expenditures, and finances its operational expenses entirely out of the revenue it generates." Id. at 764. In addition, it "possesses the power and resources to pay a judgment against it without prior approval from the state legislature or any other governmental officer or entity." Id. at 765. By contrast, the operations of the Massachusetts Lottery Commission are subject to significant control by the state

-13-

government, which approves and appropriates the Lottery Commission's annual budget. Any adverse judgment that could not be satisfied out of that budget would require additional approval and appropriation of state funds. We therefore conclude that the Lottery Commission qualifies as an "arm of the state" for purposes of the Eleventh Amendment.

## C.

Having determined that the Lottery Commission is immune from suit, we now turn to appellant's federal constitutional claims against the individual appellees. Appellant advanced three federal claims, all under the umbrella of 42 U.S.C. § 1983. First, Wojcik contends that he was deprived of a protected property interest without due process. Second, he claims a deprivation of a protected liberty interest without due process. And third, he argues a violation of the constitutional guarantee of equal protection. We address each claim separately.

## 1.

In order to maintain a constitutional due process claim arising out of the termination of his employment, a public employee must first demonstrate that he has a reasonable expectation, arising out of a statute, policy, rule, or contract, that he will continue to be employed. Perkins v. Bd. of Dirs., 686 F.2d 49, 51 (1st Cir. 1982). The employee must also demonstrate that he was deprived of that property interest without the minimum amount of process that was due under the Constitution -- in this context, the required process includes "some kind of hearing" and "some

-14-

pretermination opportunity to respond." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985); see also Gilbert v. Homar, 520 U.S. 924, 929 (1997).

We determine the claim of a protected property interest "by reference to state law." Bishop v. Wood, 426 U.S. 341, 344 (1976). Wojcik argues that his reasonable expectation of continued employment was fostered by the collective-bargaining agreement between the Lottery Commission and the Union. The agreement provided that covered employees cannot be terminated "without just cause." It is undisputed that the collective-bargaining agreement in place was valid and enforceable under Massachusetts law. See Mass. Gen. Laws ch. 150E, §§ 1-15 (providing for public-sector collective bargaining); see also Mass. Gen. Laws ch. 150C, §§ 1-16 (providing for binding arbitration of disputes arising under public-sector collective-bargaining agreements). Moreover, this Court has said that, "ordinarily, one who can be removed only for 'cause' has a constitutionally protected 'property' interest." Perkins, 686 F.2d at 51. We therefore conclude that Wojcik had a protected property interest in his continued employment. Cf. Ciambriello v. County of Nassau, 292 F.3d 307, 318 (2d Cir. 2002) (recognizing that a collective-bargaining agreement gives rise to a property interest in continued employment under New York law).

Our inquiry is not at an end, however. There remains the significant question of whether Wojcik was provided with the constitutionally adequate procedural safeguards. We conclude that he was. First, he was given an opportunity to respond to the

allegations of misconduct prior to his termination. <u>See</u> <u>Loudermill</u>, 470 U.S. at 545-46 (noting that the pretermination hearing need only be "an initial check against mistaken decisions"). It is undisputed that, when initially confronted and questioned by investigators from the Lottery Commission, Wojcik was given the chance to explain his actions, and he denied the allegation that he had played scratch tickets in violation of Lottery Commission policy. Second, the full arbitration hearing afforded by the collective-bargaining agreement was more than sufficient to satisfy the requirement for a post-deprivation hearing. <u>See</u> <u>O'Neil</u> v. <u>Baker</u>, 210 F.3d 41, 49 (1st Cir. 2000) (holding that arbitration of public employee's termination grievance satisfies the requirements of due process). Wojcik was represented by his own attorney in the arbitration, and he had ample opportunity to test both the fairness of his termination and the quality of the evidence offered against him. We therefore affirm the district court's granting of summary judgment on appellant's property-interest claim.

**2.**

Wojcik argues next that the district court erroneously granted summary judgment on his constitutional liberty-interest claim. The gravamen of this claim is that appellees were responsible for the publication of false and harmful accusations that Wojcik was involved in the theft of lottery tickets.

It is beyond cavil that "defamation, even from the lips of a government actor, does not in and of itself transgress

-16-

constitutionally assured rights." Pendleton v. Haverhill, 156 F.3d 57, 62-63 (1st Cir. 1998); see also Paul v. Davis, 424 U.S. 693, 700-01 (1976). However, an exception to this general rule exists where a public-sector employer creates and disseminates a false and defamatory impression about an employee in connection with the employee's discharge. Bd. of Regents v. Roth, 408 U.S. 564, 573 (1972). In such circumstances, the Constitution's due process protections require the employer to provide the employee with an opportunity to dispute the defamatory allegations. Codd v. Velger, 429 U.S. 624, 627-28 (1977). The employer's failure to provide an adequate name-clearing forum is actionable under § 1983.

In order to successfully establish a claim for the deprivation of a liberty interest without due process, we require the employee to satisfy five elements. First, the alleged statements must level a "charge against [the employee] that might seriously damage his standing and associations in his community" and place his "good name, reputation, honor, or integrity . . . at stake." Roth 408 U.S. at 573. Statements merely indicating the employee's improper or inadequate performance, incompetence, or neglect of duty are not sufficiently serious to trigger the liberty interest protected by the Constitution. Second, the employee must dispute the charges made against him as false. Codd, 429 U.S. at 627-28. Third, the stigmatizing statements or charges must have been intentionally publicized by the government. Bishop, 426 U.S at 348-49. That is, the defamatory charges must have been aired "in a formal setting (and not merely the result of unauthorized

-17-

'leaks')." Silva v. Worden, 130 F.3d 26, 32-33 (1st Cir. 1997). Fourth, the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment. Siegert v. Gilley, 500 U.S. 226, 234 (1991); Pendleton, 156 F.3d at 63. Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity. See Quinn v. Shirey, 293 F.3d 315, 320 (6th Cir. 2002) ("It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process."). The purpose of the hearing is only to allow the employee to clear his name of the false charges; compliance with formal procedures is not necessarily required. See Baden v. Koch, 799 F.2d 825, 833 (2d Cir. 1986) (citing Henry J. Friendly, Some Kind of Hearing, 123 U. Pa. L. Rev. 1267, 1270, 1281 (1975)); see also Quinn, 293 F.3d at 321.

In this case, there is no doubt that an allegation that Wojcik engaged in theft would be sufficiently stigmatizing to satisfy the first element of a liberty-interest claim. Likewise, there is no dispute that such a charge would be false: although Wojcik was found to have played scratch tickets in violation of state law, there was no evidence linking him to the eleven stolen books of tickets. The liberty-interest claim falters, however, at the third hurdle -- the requirement that the stigmatizing statements were intentionally publicized by the government.

Wojcik has failed to adduce any evidence that the allegedly stigmatizing statements were disseminated by government

-18-

actors in a formal setting.  See Silva, 130 F.3d at 32-33.  Indeed,

as far as the record discloses, the defamatory statements were not

made by the appellees at all.[3]  Rather, the statements were those

of newspaper reporters who hastily (and incorrectly) drew a

connection between the disappearance of the eleven books of lottery

tickets and Wojcik's suspension and subsequent termination.  The

appellees' consistent stance throughout these goings-on was that

Wojcik was investigated and terminated "for violation of Lottery

policies and procedures."  Appellees' statements were undeniably

true, regardless of whether the news media later reported on them

in a manner that erroneously suggested a more serious degree of

wrongdoing on Wojcik's part.  Although Wojcik faults appellees for

failing to alert the news media to the mistake, there is nothing in

the Constitution that compels government actors to take such steps.

We therefore affirm the district court's ruling with respect to

Wojcik's liberty-interest claim.[4]

---

[3]  Wojcik contends that some stigmatizing statements in the news
media attributed to "sources" were, in fact, statements made by, or
authorized by, the appellees.  However, the summary judgment
protocol demands that Wojcik produce actual evidence in support of
this claim.  Since he offers only speculation, rather than hard
facts, we can only view these statements as non-actionable
"unauthorized 'leaks.'"  Silva, 130 F.3d at 33.

[4]  In its ruling from the bench, the district court determined that
Wojcik's liberty-interest claim is barred by the so-called
Parratt-Hudson doctrine.  See Parratt v. Taylor, 451 U.S. 527
(1981); Hudson v. Palmer, 468 U.S. 517 (1984).  This Court
summarized the Parratt-Hudson doctrine as follows: "When a
deprivation of a property interest is occasioned by random and
unauthorized conduct by state officials, . . . the [Supreme] Court
has repeatedly emphasized that the due process inquiry is limited
to the issue of the adequacy of postdeprivation remedies provided
by the state."  Lowe v. Scott, 959 F.2d 323, 340 (1st Cir. 1992).
Since we may affirm on any ground supported by the record and

**3.**

Finally, Wojcik contends that he had a viable equal protection claim based on the selective enforcement of the lottery-playing ban against him. The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where [a] plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam).

Wojcik argues that the district court erred in granting summary judgment on the equal protection claim because it should have been up to the jury to decide whether there was a rational basis for the Lottery Commission to enforce a rule against Wojcik that allegedly had not been enforced against others. We find these contentions hollow and affirm the judgment of the district court.

The legal test we apply to the appellees' conduct is an exceptionally deferential one. An equal protection claim will only succeed if the decision to treat an individual differently than those similarly situated is wholly "arbitrary or irrational." Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Employees, 813 F.2d 484, 492 (1st Cir. 1987). In this case, appellant has failed to identify specific evidence concerning similarly situated individuals who received more lenient treatment. More importantly,

fairly presented to the court below, see Rogers v. Vicuna, 264 F.3d 1, 5 (1st Cir. 2001), we have no occasion to pass on the application of the Parratt-Hudson doctrine to the liberty-interest claim.

he has failed to adduce evidence of an arbitrary or irrational motive for the termination order.

To begin with, appellant's claim of selective prosecution was presented to, and rejected by, the arbitrator in his termination grievance. The arbitrator concluded that there was "no credible evidence . . . to support [Wojcik's] contention [that he had received] disparate treatment" from the Lottery Commission. The arbitrator found that the Lottery Commission introduced "significant evidence" during the arbitration hearing demonstrating "that [it had imposed] similar discipline" on others who played lottery games. Although the arbitrator's factual findings are not dispositive, they may be entitled to great weight. McDonald v. City of W. Branch, 466 U.S. 284, 292 n.13 (1984). In contrast to the arbitrator's findings, Wojcik's brief makes only vague allusions to individuals treated more leniently, while failing to back them up with sufficient argument and record citation. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that we do not consider arguments that are undeveloped on appeal).

As for appellees' allegedly irrational and arbitrary motivation, Wojcik contends that they made the decision to terminate him in order to protect the "public perception" of the Lottery. Although there is some evidentiary support for such a claim, there is simply nothing irrational about acting on that basis. The success of the Lottery depends on a widely held belief that the game is fairly and honestly administered. People will not

-21-

play the game (and no lottery revenues will be raised) if everyone believes that "the fix is in." Thus, when Lottery Commission officials were notified that one of their offices appeared to be rife with scandal and corruption, the responsible officials rationally decided to take swift and visible action to restore the public's confidence.

It is noteworthy, too, that appellees were acting on more than mere "perception[s]." Wojcik admits that he violated state law and the Lottery Commission's rules: he played scratch tickets in violation of Mass. Gen. Laws ch. 10, § 31; he took advantage of his position to improve his chances of winning by playing only tickets off of rolls where there had not yet been a winning ticket; and he engaged in dishonesty by having his relative cash a winning ticket. Given such clear instances of abuse, we see nothing irrational motivating appellees' actions, even though Wojcik was not responsible for outright theft.

### III.

For the reasons given above, the judgment of the district court is **<u>affirmed</u>**. Costs are taxed against the appellant. <u>See</u> Fed. R. App. P. 39(a)(2).

-22-