# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3783

_____

United States ex rel. Eric Fields

*Plaintiff - Appellee*

v.

Bi-State Development Agency of the Missouri-Illinois Metropolitan District,
doing business as Metro

*Defendant - Appellant*

Eager Road and Associates, LLC

*Defendant*

United States of America

*Movant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 5, 2017
Filed: August 1, 2017

_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Bi-State Development Agency (Bi-State) appeals the denial of its motion for summary judgment. It argues that the district court[1] erred in holding that Bi-State was not an arm of the state and therefore not entitled to Eleventh Amendment immunity in this False Claims Act (FCA) action brought by a private actor. Having jurisdiction pursuant to 28 U.S.C. § 1292(a), see P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993) (appeal from the denial of summary judgment based on sovereign immunity falls within a narrow subset of permissible interlocutory appeals), we affirm.

## I. Background

Bi-State is an interstate compact entity that owns and operates public transportation services in the City of St. Louis, Missouri; St. Louis, Charles, and Jefferson Counties in Missouri; and Madison, St. Clair, and Monroe Counties in Illinois. Bi-State was created by a compact between Illinois and Missouri, which was then ratified by Congress. Mo. Rev. Stat. § 70.370; 45 Ill. Comp. Stat. 100/1; 64 Stat. 568.

From 2003 to 2012, Eric Fields was employed by Bi-State and Eager Road and Associates, LLC (Eager Road), as an engineer. On July 28, 2014, Fields filed the instant lawsuit against Bi-State and Eager Road[2] pursuant to the qui tam provisions of the FCA. See 31 U.S.C. § 3730(b). The FCA mandates that "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for

---

[1]The Honorable Rodney W. Sippel, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]The district court granted in part and denied in part Eager Road's motion to dismiss, which is not at issue in this appeal.

payment or approval" to the government "is liable to the United States government for a civil penalty" and treble damages. 31 U.S.C. § 3729(a). Fields alleged that, when submitting claims to the federal government, Bi-State falsely certified that it was in compliance with the Hatch Act and Missouri law. Specifically, Fields claimed that Bi-State raised funds for a St. Louis county executive's re-election campaign and ordered its employees to volunteer for the campaign, despite federal and state prohibitions on employee participation in political activity. The government declined to intervene, and Fields proceeded with the case independently. See 31 U.S.C. § 3730(b)(4)(B) (private actor may proceed with FCA claim where government declines to intervene).

On March 27, 2015, Bi-State moved for summary judgment, arguing that it did not qualify as a "person" under the FCA. The district court denied Bi-State's motion and Bi-State appealed. In that appeal, Bi-State argued that it did not meet the FCA's definition of "person," and that it was entitled to Eleventh Amendment immunity. Because the decision below addressed only the FCA—not the Eleventh Amendment—we dismissed the interlocutory appeal for lack of jurisdiction. United States ex rel. Fields v. Bi-State Dev. Agency of the Mo.-Ill. Metro. Dist., 829 F.3d 598, 600 (8th Cir. 2016). On remand, Bi-State moved for summary judgment on Eleventh Amendment immunity grounds. The district court denied Bi-State's motion, finding that Bi-State is akin to a local governmental entity and therefore not entitled to Eleventh Amendment immunity. Bi-State now appeals that decision.

## II. Discussion

Bi-State "bears the burden of showing that it is an arm of the state." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 99 (1st Cir. 2002); see Fields, 829 F.3d at 600 ("[A]ll of our sister circuits to address the issue have recognized that an entity asserting Eleventh Amendment immunity bears the burden of showing its entitlement to such immunity."). "We cannot extend the Eleventh Amendment's protection to a

-3-

bistate agency unless we have 'good reason to believe that the [compacting] [s]tates structured the new agency to enable it to enjoy the special constitutional protection of the [s]tates themselves.'" Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy, 948 F.2d 1084, 1086 (8th Cir. 1991) (alteration in original) (quoting Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979)). We review denials of summary judgment on sovereign immunity grounds de novo, "considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving" party. Van Whye v. Reisch, 581 F.3d 639, 648 (8th Cir. 2009).

The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "The Eleventh Amendment protects a bistate agency if the agency is an arm of the compacting states, but not if the agency is comparable to a local governmental entity like a county or municipality." Barket, 948 F.2d at 1086.

In Barket, we addressed the very issue now before us: whether Bi-State is akin to an arm of the state or a local entity for purposes of Eleventh Amendment immunity. There, we explained that "[t]here is no litmus test to determine whether a bistate agency is more like an arm of the compacting states or more like a local governmental entity." Id. Instead, this determination requires us to examine the "nature of the entity created by state law," id. (internal quotation omitted), by considering the following factors:

> (1) whether the compacting states characterize the agency as an arm of the compacting states or as a local governmental entity; (2) whether the compacting states fund the agency; (3) whether the compacting states are financially responsible for the liabilities and obligations the agency incurs; (4) whether the agency's commissioners are appointed by the compacting

-4-

states or by local governments; (5) whether the functions the agency performs are traditionally state or municipal; and (6) whether the compacting states can veto the agency's actions.

Id. We concluded that Bi-State was "more like a local governmental entity than an arm of Missouri and Illinois." Id. at 1088.

Here, Bi-State does not dispute that Barket decided this issue. Instead, it argues that the law Barket relied on has changed, rendering Barket outdated and justifying our reconsideration of the Barket factors as applied to Bi-State. We address each of the six factors, first addressing those related to Bi-State's level of operational independence from the Missouri and Illinois and then addressing those related to Bi-State's financial relationship with the states. We then consider the overarching interests protected by the Eleventh Amendment.

## 1.    Missouri and Illinois' Characterization of Bi-State

We first consider the states' characterizations of Bi-State. After judicial abrogation of sovereign immunity in 1977, the Missouri legislature reinstated sovereign immunity in 1978 through the enactment of Missouri Statute § 537.600. See State ex rel. Trimble v. Ryan, 745 S.W.2d 672, 673 (Mo. banc 1988). Section 537.600 reinstated "'[s]uch sovereign or governmental tort immunity as existed at common law prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date" or contained in the statute's listed exceptions. Id.

When Barket was decided, § 537.600.4 provided that, "prior to September 12, 1977, there was no sovereign or governmental immunity for the proprietary functions of multi-state compact agencies . . . including functions such as the operation of motor vehicles and the maintenance of property, involved in the operation of a public

transit or public transportation system." Mo. Rev. Stat. § 537.600(4) (1988). Barket relied in part on this provision to find that Illinois and Missouri law "treat[ed] Bi-State like a county or municipality," and that the first factor therefore weighed in favor of finding that Bi-State was more like a local entity. Barket, 948 F.2d at 1087.

In 2005, the Missouri legislature deleted various statutory waivers of sovereign immunity, including § 537.600.4's clarification that Missouri did not understand multi-state compact entities to have sovereign immunity prior to 1977. Absent § 537.600.4, there is no applicable "prescribed exception" to Missouri's general rule that all public entities are entitled to sovereign immunity from suit in state court. Trimble, 745 S.W.2d at 673 (internal quotation omitted). Bi-State argues that the Missouri legislature's 2005 deletion of the statutory waiver of sovereign immunity for multistate compact agencies indicates that this factor should now weigh in favor of finding that Bi-State is an arm of the state.

However, Missouri's characterization of Bi-State for purposes of common law tort immunity was not the sole basis for Barket's conclusion that Illinois and Missouri treat Bi-State more like a municipality than an arm of the state. Barket also noted that the compact creating Bi-State characterizes it as "a body corporate and politic," provides that "Bi-State's property possesses the same status as property belonging to cities for the purpose of state taxation," and empowers Bi-State to "collect fees and issue revenue bonds." Barket, 948 F.2d at 1087 (citing Mo. Rev. Stat. §§ 70.370, 70.375). Each of these facts supports the conclusion that Bi-State is more like a municipality than an arm of the state. See Pub. Sch. Ret. Sys. of Mo. v. State Street Bank & Trust Co., 640 F.3d 821, 827–28 (8th Cir. 2011) (characteristics of operational independence include "being organized as a 'body corporate,'" and "possessing the ability to buy, sell, and hold property" (quoting Moor v. Alameda Cty., 411 U.S. 693, 719 (1973))).

Although several of the considerations supporting <u>Barket</u>'s conclusion that state law treats Bi-State as a municipality remain unchanged, the deletion of the statutory waiver of sovereign immunity for multistate entities constitutes a change in the law since <u>Barket</u>. On the other hand, Illinois has relatively recently characterized Bi-State as a local public entity under its tort immunity act. <u>Hubble v. Bi-State Dev. Agency</u>, 938 N.E.2d 483, 492 (Ill. 2010). Because considerations underlying this factor weigh both in favor of and against finding Bi-State to be an arm of the state, we find that this factor is neutral.

## 2. Appointment of Commissioners

We next consider the process by which Bi-State's commissioners are appointed. Bi-State's board of commissioners has ten people: five from Illinois and five from Missouri. <u>See</u> Mo. Rev. Stat § 70.370, art. IV; 45 Ill. Comp. Stat. 100/1, art. IV. Illinois' commissioners are appointed by the chairs of the boards of the counties within Bi-State's territory, with the advice and consent of their respective county boards. 45 Ill. Comp. Stat. 105/2(a). The Missouri Governor appoints Missouri's commissioners with the advice and consent of the Missouri senate. Mo. Rev. Stat. § 70.380. Missouri's Governor chooses the commissioners from a panel of nominees selected by the mayor of the city of St. Louis and the county executive of St. Louis County. Mo. Rev. Stat. § 70.385.

The fact that Illinois' commissioners—who comprise half of Bi-State's board of commissioners—are appointed by the chairs of county boards weighs in favor of finding that Bi-State is more like a local entity. <u>Cf.</u> <u>Leitner v. Westchester Comm. College</u>, 779 F.3d 130, 138–39 (2d Cir. 2015) (no "effective [state] control over decision-making" established when governor appointed four out of ten board members). However, the Missouri Governor's appointment of Missouri's commissioners weighs in favor of finding that Bi-State is an arm of the state. <u>See</u> <u>State Street Bank</u>, 640 F.3d at 828–29 ("A State's appointment power, even if limited,

restricts an entity's political independence because it may produce 'subtle or indirect manipulation of the entity's decision-making processes' by state officials." (quoting Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1207 (1st Cir. 1993))); see also Morris v. Wash. Metro. Area Transit Auth., 781 F.2d 218, 227–28 (D.C. Cir. 1986) (finding significant measure of state control over directors where, though states have little control over their appointment, states can remove directors from office). Though there is evidence pointing in both directions with respect to this factor, the parties agree that it weighs in favor of Bi-State being an arm of the state. See Barket, 948 F.2d at 1087–88.

### 3.    Bi-State's Functions

Next, we consider whether Bi-State performs traditionally state or traditionally municipal functions.  Bi-State operates and maintains public transit systems, including buses, airports, parking facilities, tunnels, and bridges, in designated counties in Missouri and Illinois.  Bi-State also plans and establishes policies for sewage and disposal functions and land use patterns. See id. at 1086.

"The regulation of land use is traditionally a function performed by local governments." Lake Country, 440 U.S. at 402.  However, "[s]tates and municipalities alike own and operate bridges, tunnels, ferries, marine terminals, airports, bus terminals, industrial parks, also commuter railroads." Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 45 (1994); see Trimble, 745 S.W.2d at 674 ("[S]uch diverse entities as municipal housing authorities, hospital districts, special road districts, sewer districts, and counties have been held to be political subdivisions of the state rather than municipal corporations when sovereign immunity issues [under the Missouri tort immunity statute] are involved." (internal citations omitted)). Therefore, Bi-State's functions are not "readily classified as typically state or unquestionably local," and this factor "does not advance our Eleventh Amendment inquiry." Hess, 513 U.S. at 45.

**4.      Missouri and Illinois' Ability to Veto Bi-State's Actions**

We next examine whether Missouri and Illinois have the power to veto Bi-State's actions. The compact provides that "[e]ach state reserves the right hereafter to provide by law for the exercise of the veto power by the governor thereof over any action of any commissioner appointed" by Bi-State's board members. Mo. Rev. Stat. § 70.370, art. V; 45 Ill. Comp. Stat. 100/1, art. V. Bi-State must also provide an annual report to the governors of Missouri and Illinois detailing its operations and transactions. Mo. Rev. Stat. § 70.370, art. III; 45 Ill. Comp. Stat. 100/1, art. III. Illinois and Missouri have the right to approve Bi-State's development plans, rules, and regulations. Mo Rev. Stat. § 70.370, art. III; 45 Ill. Comp. Stat. 100/1, art. III. We find, and the parties do not dispute, that Missouri and Illinois' power to veto Bi-State's actions weighs in favor of finding that Bi-State constitutes an arm of the state.

**5.      Bi-State's Sources of Funding**

Next, we consider the sources of Bi-State's funding. The compact creating Bi-State "makes no specific provision for state funding of Bi-State," but "authorizes several methods for Bi-State to generate operating revenue." Barket, 948 F.2d at 1087. Bi-State can "charge and collect fees for use of the facilities owned and operated by it," can "receive for its lawful activities any contributions or moneys appropriated by municipalities, counties, state or other political subdivisions or agencies; or by the federal government or any agency or officer thereof," and can "issue bonds upon the security of the revenues to be derived from [its] facilities; and, or upon any property held or to be held by it." Mo Rev. Stat. § 70.370, art. III; 45 Ill. Comp. Stat. 100/1, art. III. Bi-State argues that it is not self-funding because it receives minimal revenue from its transit operations and other independent revenue-generating operations, and instead receives the bulk of its funding from the federal government and the States of Missouri and Illinois.

As an initial matter, we note that federal funding is not attributable to the states, and therefore receipt of federal funds does not weigh in favor of Bi-State being an arm of Missouri and Illinois. See, e.g., Christy v. Penn. Turnpike Comm'n, 54 F.3d 1140, 1145 (3rd Cir. 1995) ("[T]olls, rents, bond and note revenues, and federal funding . . . are not state-derived.").

In support of its argument that Bi-State is primarily funded by the states of Missouri and Illinois, Bi-State attached to its motion for summary judgment an affidavit from its Chief Financial Officer detailing funding information for fiscal years 2009–2014. Included in Bi-State's seven sources of funding during this period are St. Louis County, the City of St. Louis, and the St. Clair Transit District—all city or county entities within Bi-State's territory. Of the funding received from St. Louis County and the City of St. Louis between 2009 and 2014, approximately 40 percent came from the 1973 Transportation Sales Tax Act. See Mo. Rev. Stat. §§ 94.600 to .655 & 94.660. Bi-State alleges that funds contributed by the city and county of St. Louis pursuant to this tax are "indirect" state funding "through appropriations authorized specifically by state statutes."

The 1973 Transportation Sales Tax Act authorizes Missouri cities to impose transportation sales taxes through a majority vote of their governing bodies. Mo. Rev. Stat. § 94.605. Funds generated through these taxes "shall be deposited with the state treasurer in a special trust fund," called the Transportation Sales Tax Trust Fund. Mo. Rev. Stat. § 94.625. While money from these city taxes are held by the state treasurer, "[t]he moneys in this fund are not state funds and shall not be commingled with any funds of the state." Id.; see also Mo. Rev. Stat. § 94.660.6 (same). "State control over an entity's ability to obtain funds"—for example, by allowing Bi-State to receive funds from cities' and counties' transportation tax revenue—"is inadequate to demonstrate state ownership of the funds where the state is not shown to have a financial interest that would be directly and adversely affected by the diminution of the funds in question." Christy, 54 F.3d at 1146. Funds generated pursuant to the

-10-

1973 Transportation Sales Tax Act do not constitute state funds, and payments out of this fund are therefore not attributable to the state.

Focusing on the funds contributed by the states themselves, only a "notably modest" 1.3 percent of Bi-State's funding came from Missouri and Illinois between 2009 and 2014. Hess, 513 U.S. at 37–38 (states' agreement to pay for some of the entity's expenses did not weigh in favor of finding the entity to be an arm of the state because the states "in no way under[took] to cover the bulk of the [entity's] operating and capital expenses"); Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Ed., 466 F.3d 232, 245 (2d Cir. 2006) (funding factor weighs against immunity when school district received 39.9 percent of its funding from the state); Barket, 948 F.2d at 1087 ("The possibility of voluntary appropriation of state funds . . . does not trigger sovereign immunity."). But see Colby v. Herrick, 849 F.3d 1273, 1277 (10th Cir. 2017) (funding factor cuts both ways when entity is self-funded and entitled to issue bonds, but also receives money from the state). Bi-State's reliance on state funding is minimal when compared with other funding sources, and this factor weighs in favor of finding that Bi-State is more like a local governmental entity. Barket, 948 F.2d at 1087.

## 6.    Responsibility for Bi-State's Liabilities

Finally, we consider whether Missouri and Illinois are responsible for Bi-State's liabilities. We focus "not on a mechanical analysis of whether a State will ultimately pay a judgment," but on "whether the state treasury is legally responsible for the payment of a judgment against the [alleged arm of the State]." Maliandi v. Montclair State Univ., 845 F.3d 77, 86 (3d Cir. 2016) (quoting Febres v. Camden Bd. of Ed., 445 F.3d 227, 233 (3d Cir. 2006)). The parties agree that Missouri and Illinois are not statutorily obligated to pay Bi-State's debts, but Bi-State argues that Missouri and Illinois are functionally liable for them. See Lake Country, 440 U.S. at 400–01.

-11-

Bi-State argues that the states' responsibility for its debts is evidenced by Bi-State's entitlement to pay any liabilities out of the Missouri State Legal Expense Fund (SLEF). Under Missouri law, money in the SLEF "shall be available for the payment of any claim or any amount required by any final judgment rendered by a court of competent jurisdiction against . . . [t]he State of Missouri, or any *agency of the state* . . . pursuant to . . . section 537.600." Mo. Rev. Stat. § 105.711.2(1) (emphasis added). Section 537.600.1 provides for "sovereign or governmental tort immunity as existed at common law" prior to 1977, to "public entit[ies]"—including Bi-State—"except to the extent waived" by statute. See Mo. Rev. Stat. § 537.600.3 (defining "public entity" to include "any multistate compact agency created by a compact formed between [Missouri] and any other state which has been approved by the Congress of the United States"). Therefore, where a state agency is sued as a public entity pursuant to a statutory waiver of sovereign immunity found in § 537.600, the state agency is eligible to recover the amount of its resulting liability from the SLEF.

Bi-State argues that, because it is a public entity entitled to a presumption of sovereign immunity against state law tort claims pursuant to § 537.600—as discussed with respect to the first factor—it is entitled to recover expenses out of the SLEF by virtue of § 105.711.2(1)'s reference to § 537.600. Bi-State's argument relies on the assumption that all "public entities" entitled to a presumption of sovereign immunity under § 537.600 are necessarily "agencies of the state" under § 105.711.2. But § 105.711.2 does not define "agency of the state," and Bi-State cites no support for its contention that its status as a "public entity" under § 537.600 mandates that Bi-State is also a state agency entitled to funds from the SLEF. Furthermore, any inquiry into whether Bi-State constitutes a state agency for purposes of the SLEF is distinct from whether Bi-State is an arm of the state for purposes of the Eleventh Amendment.

Aside from its SLEF argument, Bi-State provides little support for its contention that this factor weighs in its favor, particularly in light of the fact that it

receives such a small percentage of its funding from Missouri and Illinois. See State Street Bank, 640 F.3d at 830 ("A State's role in financing an entity's operation can indicate whether a money judgment in favor of the entity may benefit the State's treasury."); Leitner, 779 F.3d at 138 (entity's receipt of "one-third of its budget from the state . . . alone is not sufficient to establish state responsibility for" entity's financial obligations). Bi-State points to no additional changes in the law since we held in Barket that this factor weighed in favor of finding that Bi-State is akin to a local governmental entity. Therefore, we find that this factor supports a finding that Bi-State is more like a local governmental entity. See Barket, 948 F.2d at 1088 ("[N]othing obligates Missouri and Illinois to satisfy Bi-State's liabilities and obligations.").

7.      **Other Considerations**

As explained above, in this case, the Barket factors "point in different directions." Hess, 513 U.S. at 47. Therefore, we turn to the "Eleventh Amendment's twin reasons for being" as our "prime guide" in determining whether Bi-State is more like an arm of the state or a local governmental entity. Id. Those "twin reasons for being" are (1) respect for the dignity of the states as sovereigns, and (2) the "prevention of federal-court judgments that must be paid out of a State's treasury." Id. at 47–48.[3]

---

[3]We have also applied a two-factor arm-of-the-state test that correlates closely with these "twin interests." See State Street Bank, 640 F.3d at 827 (applying a two-factor test considering independence and financial responsibility in determining whether a school board is an arm of the state). Because the six-factor and two-factor tests are not inconsistent, see Leitner, 779 F.3d at 135–37 (applying both a six-factor and a two-factor test when the tests are both valid and not contradictory), we consider both the specific factors of the six-factor test and the more general concerns of the two-factor test, see State Street Bank, 640 F.3d at 827–33.

With respect to the Eleventh Amendment's first "reason for being"—respect for the dignity of states as independent sovereigns—"[b]istate entities occupy a significantly different position in our federal system than do the states themselves." Hess, 513 U.S. at 40. They are "creations of three discrete sovereigns: two States and the Federal Government." Id. As such, "there is good reason not to amalgamate Compact Clause entities with agencies of 'one of the United States' for Eleventh Amendment purposes." Id. at 42. Generally, "[s]uit in federal court is not an affront to the dignity of a [bistate] entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign." Id. at 41. Therefore, suits against bistate entities do not present the same issues of sovereign immunity as those against a state, cf. Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 751–52 & n.6 (2002) (addressing sovereignty interests where parties do not dispute that defendant is an arm of the state), and allowing Bi-State to be sued in federal court poses "no genuine threat to the dignity of" Missouri or Illinois, Hess, 513 U.S. at 47. We therefore "presume [Bi-State] does not qualify for Eleventh Amendment immunity '[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose.'" Id. at 43–44 (second alteration in original) (quoting Lake Country, 440 U.S. at 401).

In determining whether a good reason exists to find that Bi-State is entitled to immunity, "the most important factor . . . is 'whether a judgment against the entity [could] be satisfied out of a State's treasury.'" Leitner, 779 F.3d at 137 (quoting Hess, 513 U.S. at 31); see also Hess, 513 U.S. at 48 (referring to the "prevention of federal-court judgments that must be paid out of a State's treasury" as the "impetus for the Eleventh Amendment" and collecting cases where appellate courts have "recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations"). As noted, Bi-State's records indicate that state funding comprises less than two percent of its operating budget, in contrast with "the situation of transit facilities that place heavy fiscal tolls on their founding

-14-

States." Hess, 513 U.S. at 49. And, though Missouri and Illinois may volunteer to assist paying a judgment against Bi-State, they are not obligated to do so. See Barket, 948 F.2d at 1087 (compact language allowing availability of funding not construed to mandate funding).

Though Missouri has modified its sovereign immunity statute, the considerations underlying the other Barket factors remain largely unchanged. Furthermore, all factors involving the states' financial obligations to Bi-State weigh in favor of finding that Bi-State is more like a local governmental entity. Therefore, while the factors point in different directions, we find that the changes in the underlying considerations of Barket's analysis fail to provide "good reason to believe" that Illinois and Missouri structured Bi-State to allow it to "enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose." Hess, 513 U.S. at 43–44.

## III. Conclusion

We affirm the district court's denial of Bi-State's motion for summary judgment and remand for further proceedings.

———————————————