# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 10-1244/10-2674

_____

Public School Retirement System of    *
Missouri; Public Education Employee    *
Retirement System of Missouri,    *
   *
        Plaintiffs - Appellees,    *
   *    Appeal from the United States
      v.    *    District Court for the Western
   *    District of Missouri.
State Street Bank & Trust Company,    *
   *
        Defendant - Appellant.    *

_____

Submitted:  January 11, 2011
Filed:  May 23, 2011

_____

Before MURPHY, BYE, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

State Street Bank & Trust Company ("State Street") agreed to manage and invest some of the assets of the Public School Retirement System of Missouri ("PSRS") and of the Public Education Employee Retirement System of Missouri ("PEERS"). (We collectively refer to PSRS and PEERS as the "Retirement Systems" or "Systems.")  The Retirement Systems allege that State Street violated a number of its statutory and common-law duties while managing the Systems' assets.  The Retirement Systems sought relief by filing an action in Missouri state court against State Street.  State Street twice removed this case to the U.S. District Court for the

Western District of Missouri, and the district court[1] twice remanded this case to state court. State Street appeals both orders. We have consolidated the appeals, and we now affirm.

## I. Background

The State of Missouri created PSRS and PEERS in 1946 and 1965, respectively, "[f]or the purpose of providing retirement allowances and other benefits" to public-school employees who work in districts with populations of less than 400,000 people.[2] Mo. Rev. Stat. §§ 169.020(1), .610(1). The Retirement Systems are funded by contributions from public-school employees and their employers, which are generally local school districts. §§ 169.030(1), .620(1). A seven-member board of trustees ("Board") operates the Retirement Systems and is responsible for investing the Systems' assets. §§ 169.020(2), .040(2), .610(2), .630(2). Pursuant to this statutory obligation, the Board entered into multiple agreements with State Street in 1995 to provide for the management and investment of the Retirement Systems' assets.

In 2008, over $7 billion of the Retirement Systems' assets were invested in one of State Street's investment vehicles called the Quality D Fund. Between October 31, 2008, and May 29, 2009, the Board withdrew much of the Retirement Systems' assets from the fund. State Street claimed this withdrawal was wrongful, so in September of 2009 it ordered the Board to transfer much of the withdrawn funds back into the Quality D Fund. The Board refused to make the transfer, however, claiming that doing so would have resulted in a $125 million loss to the Retirement Systems. In response, State Street devalued the Retirement Systems' remaining interest in the

[1] The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

[2] Teachers are members of PSRS, and other full-time public-school employees are members of PEERS. §§ 169.050, .600(5).

-2-

Quality D Fund. According to the Board, this devaluation resulted in a loss of nearly $100 million to the Retirement Systems.

The Retirement Systems brought an action in Missouri state court on October 16, 2009, alleging that State Street violated its fiduciary and contractual obligations to the Systems. That same day, State Street filed a notice of removal with the U.S. District Court for the Western District of Missouri, arguing that the diversity-of-citizenship-jurisdiction statute, 28 U.S.C. § 1332(a)(1), gave the district court original jurisdiction over the action. On October 28, 2009, the Retirement Systems filed a motion to remand on the grounds that (1) a forum-selection clause in one of their agreements with State Street gave them the right to litigate the case in state court and (2) the district court did not have original jurisdiction over the action because neither PSRS nor PEERS is a "citizen" of Missouri for purposes of § 1332(a)(1). The district court granted the Retirement Systems' motion to remand on January 21, 2010. The district court "assume[d], without deciding," that it had original jurisdiction over the case pursuant to § 1332(a)(1), but it found that State Street's agreements with the Retirement Systems gave the Systems the right to litigate the case in state court.

Following the district court's remand, the Retirement Systems amended their petition on April 1, 2010. In addition to their previous allegations, the Systems alleged, among other things, that State Street violated its duties of good faith and fair dealing, violated Missouri's Merchandising Practices Act, and committed negligence. On the same day that the Retirement Systems amended their petition, State Street filed a second notice of removal with the U.S. District Court for the Western District of Missouri, again arguing that the district court had original jurisdiction over the action pursuant to § 1332(a)(1). On April 13, 2010, the Retirement Systems filed a second motion to remand, arguing that remand was proper for the same reasons they argued the first remand was proper. On July 1, 2010, the district court granted the Systems' second motion to remand, again finding that State Street's agreements with the Retirement Systems gave the Systems the right to litigate the case in state court.

State Street appeals both of the district court's remand orders. State Street argues that the district court erroneously remanded the case because the forum-selection clause upon which the district court twice remanded the case does not give the Retirement Systems the right to litigate this case in state court. In response, the Retirement Systems argue that 28 U.S.C. § 1447(d) precludes our review of the district court's remand orders. Alternatively, the Systems argue that if we do have jurisdiction to review the orders, we should affirm, either because the district court properly found that a contractual forum-selection clause gives the Retirement Systems the right to litigate this case in state court, or because the district court lacked original jurisdiction over this case.

## II. Discussion

### A.

The Retirement Systems first argue that 28 U.S.C. § 1447(d) prohibits our review of the district court's remand orders. Section 1447(d) generally provides that "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." Despite this broadly worded prohibition, the Supreme Court has held that § 1447(d) only bars appellate review of a district court's remand order that is "based on a ground specified in [28 U.S.C.] § 1447(c)." Carlsbad Tech., Inc., v. HIF Bio., Inc., 129 S. Ct. 1862, 1866 (2009) (citing Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 345–46 (1976)). This means that "remand orders based on a procedural defect or lack of subject matter jurisdiction are unreviewable." Carlson v. Arrowhead Concrete Works, Inc., 445 F.3d 1046, 1050 (8th Cir. 2006).

The Retirement Systems argue that § 1447(d) bars our review because the district court "assume[d], without deciding," that it had subject-matter jurisdiction. The Systems do not dispute, however, that the actual grounds for the district court's

remand order was the presence of a forum-selection clause in an agreement between the Retirement Systems and State Street. Nearly every circuit has held that § 1447(d) does not prohibit appellate review of a district court's remand order based upon a forum-selection clause. See FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC, 626 F.3d 752, 755 (4th Cir. 2010) (citing cases from every circuit except the Eighth Circuit and D.C. Circuit and noting that "[e]very circuit to have considered the issue has held that a remand order based on a forum selection clause is reviewable on appeal"). We agree with our sister circuits. A remand order based upon a contractual forum-selection clause is not a remand based upon a procedural defect or lack of subject-matter jurisdiction. Therefore, since the district court's remand order was not based upon a ground "specified in § 1447(c)," Carlsbad Tech., Inc., 129 S. Ct. at 1866, § 1447(d) does not prohibit our review of the district court's orders, even though the district court assumed without deciding that it had subject-matter jurisdiction over the case.

B.

Next, we turn to State Street's argument that the district court erred in remanding this case to state court. After the district court "assume[d], without deciding," that it had original jurisdiction over this case, the district court remanded the case based upon a forum-selection clause in an agreement between the Retirement Systems and State Street. We have stated, however, that "a court may not assume 'hypothetical jurisdiction' to decide 'contested questions of law when its jurisdiction is in doubt.'" Ark. Blue Cross & Blue Shield v. Little Rock Cardiology Clinic, P.A., 551 F.3d 812, 816 (8th Cir. 2009) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998)). Instead, we have noted that "jurisdiction is a threshold question and must be answered before all other questions." Ginters v. Frazier, 614 F.3d 822, 826 (8th Cir. 2010). Therefore, rather than considering whether the district court correctly remanded this case based upon a forum-selection clause in an agreement between the Retirement Systems and State Street, we first address whether State

Street, as the removing party, has established by a preponderance of the evidence that the district court had original jurisdiction over this case. Altimore v. Mount Mercy Coll., 420 F.3d 763, 768 (8th Cir. 2005).

In removing this case pursuant to 28 U.S.C. § 1441(a), State Street alleged that the district court had original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Section 1332(a)(1) provides that a district court has "original jurisdiction" over civil actions where the amount in controversy exceeds $75,000 and the controversy is between "citizens of different states." It is undisputed that the amount in controversy exceeds $75,000 and that State Street is a citizen of Massachusetts. The critical issue is whether both PSRS and PEERS are "citizens" for purposes of § 1332(a)(1).

In determining whether the Retirement Systems are citizens for purposes of § 1332(a)(1), we first note that "[t]here is no question that a State is not a 'citizen' for purposes of [§ 1332(a)(1)]." Moor v. Cnty. of Alameda, 411 U.S. 693, 717 (1973); see also Alternate Fuels, Inc. v. Cabanas, 435 F.3d 855, 857 n.2 (8th Cir. 2006). Nor is an entity that is merely an "alter ego" or "arm" of a State a citizen for purposes of § 1332(a)(1). Moor, 411 U.S. at 717. Our court has not clearly identified the appropriate standard for determining when an entity is an "arm" of a State for purposes of § 1332(a)(1). We have, however, developed a standard for determining when an entity is an arm of a State for purposes of obtaining immunity under the Eleventh Amendment. See, e.g., Thomas v. St. Louis Bd. of Police Comm'rs, 447 F.3d 1082, 1084 (8th Cir. 2006); Gorman v. Easley, 257 F.3d 738, 743 (8th Cir. 2001), rev'd on other grounds sub nom. Barnes v. Gorman, 536 U.S. 181 (2002). Like the § 1332(a)(1) inquiry, the ultimate question of whether an entity is an arm of a State for purposes of the Eleventh Amendment turns on whether a State is the real party in interest in a case involving the entity. Compare Sherman v. Curators of the Univ. of Mo., 16 F.3d 860, 863 (8th Cir. 1994) ("Courts considering an entity's claim of eleventh amendment immunity must therefore determine whether the suit is *in reality*

*a suit against the state*." (emphasis added) (internal quotation marks omitted)), with State Highway Comm'n v. Utah Constr. Co., 278 U.S. 194, 200 (1929) (concluding that an entity was an arm of a State for purposes of diversity-of-citizenship jurisdiction because a State was the "real part[y] in interest"); see also Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1203 (1st Cir. 1993) (noting that "whether an entity is a citizen of the State for diversity purposes, or a State for Eleventh Amendment . . . purposes . . . present[s] the same ultimate question for decision: whether the State . . . remains the *real party in interest*"). Thus, we will apply our Eleventh Amendment standard to determine whether the Retirement Systems are arms of the State of Missouri.[3] See Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 260–61 (4th Cir. 2005) (applying the court's Eleventh Amendment standard to determine whether an entity is an arm of a State for purposes of § 1332(a)(1)); Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 412 (11th Cir. 1999) (same); Univ. of R.I., 2 F.3d at 1203 (same); Ramada Inns, Inc. v. Rosemount Mem'l Park Ass'n, 598 F.2d 1303, 1306 (3d Cir. 1979) (same).

Our court's arm-of-a-State test requires a close analysis of the Retirement Systems' relationship with the State of Missouri. Although whether the Retirement Systems are arms of the State of Missouri is a question of federal law, we engage in a detailed analysis of state law. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 n.5 (1997); Thomas, 447 F.3d at 1084. First, we consider the Systems' independence from the State of Missouri. See Thomas, 447 F.3d at 1084 (noting that the arm-of-a-State test considers an entity's "degree of autonomy and control over its

---

[3] State Street argues that the Supreme Court created an eight-factor "test" in Moor for determining whether an entity is an arm of a State for purposes of § 1332(a)(1). In Moor, the Court certainly listed facts that are highly relevant for determining whether an entity is an arm of a State for purposes of § 1332(a)(1), see Moor, 411 U.S. at 719–20, but it is unclear whether the Court intended to articulate a test. In any event, we believe our well-developed standard for determining whether an entity is an arm of a State for purposes of the Eleventh Amendment allows us to thoroughly consider the factors that the Court addressed in Moor.

own affairs"); Gorman, 257 F.3d at 743 (noting that we also consider an entity's "powers and characteristics under state law").  Second, we consider how a money judgment in litigation involving the Retirement Systems could affect the State of Missouri's treasury.  See Thomas, 447 F.3d at 1084.  Specifically, since the Retirement Systems are plaintiffs who seek recovery of a money judgment, we consider whether a recovery in their favor could benefit the State of Missouri's treasury.  See Hertz v. Knudson, 6 F.2d 812, 816 (8th Cir. 1925); compare Gorman, 257 F.3d at 743 (indicating that, when the entity is a defendant, we consider whether a money judgment against the entity could "flow from the state treasury"), with Md. Stadium Auth., 407 F.3d at 262 (citing Mo, Kan., & Tex. Ry. Co. v. Hickman, 183 U.S. 53, 59 (1901)) (indicating that, when the entity is a plaintiff, the court looks to "whether any recovery by the entity will inure to the benefit of the state").  In applying our arm-of-a-State test, we keep in mind that the ultimate question remains whether the State of Missouri is the real party in interest in this case.

i. The Retirement Systems' Independence from the State of Missouri

We first analyze the Retirement Systems' independence from the State of Missouri.  Courts generally assess an entity's independence in comparison to the type of independence that a political subdivision possesses.  Regents, 519 U.S. at 429 n.5 (noting that the question was whether a "state agency has the same kind of independent status as a county or is instead an arm of the State"); Mount Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (noting that the question was whether a local school board was "to be treated as an arm of the State . . . or [was] instead to be treated as a municipal corporation or other political subdivision").  The more an entity's independence resembles that of a political subdivision, the less likely the entity is an arm of a State.  See Mount Healthy, 429 U.S. at 280 (noting that "counties and similar municipal corporations" are not arms of States); Illinois v. City of Milwaukee, 406 U.S. 91, 97 (1972) ("It is well settled that for the purposes of diversity of citizenship, political subdivisions are citizens of their respective States.").

Political subdivisions generally enjoy significant operational independence. These characteristics of operational independence may include being organized as a "body corporate," possessing the ability to buy, sell, and hold property, and possessing the ability to sue and be sued in the entity's own name. Moor, 411 U.S. at 719. The Retirement Systems possess some of these characteristics. The entities are "bod[ies] corporate," have the power to sue and be sued in their own name, and can "transact all of [their] business, invest all of [their] funds, and hold all of [their] cash, securities, and other property." §§ 169.020(1), .610(1). The Retirement Systems' possession of these powers, however, does not preclude a finding that they are arms of the State of Missouri. The Supreme Court has held an entity to be an arm of a State despite its ability to sue and be sued in its own name, State Highway Comm'n, 278 U.S. at 199, and the Second Circuit has held an entity to be an arm of a State despite its designation as a corporate body. See McGinty v. New York, 251 F.3d 84, 96 (2d Cir. 2001).

Other state statutes, moreover, greatly restrict the Retirement Systems' operational independence. Whereas a typical political subdivision may provide a wide variety of services, the State of Missouri created PSRS and PEERS solely to "provid[e] retirement allowances and other benefits" to public-school employees who work in districts with populations of less than 400,000 people. §§ 169.020(1), .610(1). Not only are the Retirement Systems much more limited in their purpose than political subdivisions, but state law also greatly regulates the way the Systems carry out their limited purpose. Among the most important regulations, statutes dictate the sources of the Systems' revenue, §§ 169.030(1), .620(1), the amount of funds each revenue source provides, §§ 169.030(1), .620(1), to what extent these revenue amounts may be increased, §§ 169.030(4), .620(4), when the Systems are to pay benefits, §§ 169.060, .660, and the amount of benefits the Systems are to pay, §§ 169.070, .670. Restrictions such as these are important because they indicate that not only has the State of Missouri created the Retirement Systems for a limited purpose, but that the State extensively regulates the way the Systems carry out this limited

purpose. Cf. Hadley v. N. Ark. Cmty. Technical Coll., 76 F.3d 1437, 1439–40 (8th Cir. 1996) (noting that the State of Arkansas provided an entity with significant autonomy with respect to how it could achieve its organizational purpose, but still ultimately concluding that the entity was an arm of the State of Arkansas). These restrictions indicate that, compared to a typical political subdivision, the Retirement Systems possess little operational independence from the State of Missouri.

In addition to operational independence, political subdivisions generally possess political independence from States. Thus, the greater the State's ability to appoint an entity's leaders, the more likely the entity is an arm of the State. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 44 (1994). In this case, the Governor of Missouri appoints three of the seven members of the Retirement Systems' Board with the Missouri Senate's consent. § 169.020(2). Since the State of Missouri appoints fewer than half of the Retirement Systems' Board, the Retirement Systems have some political independence from the State of Missouri. However, the fact that the State of Missouri does not appoint all or even a majority of the Board's members is not dispositive. Hadley, 76 F.3d at 1441–42 (concluding that an entity is an arm of a State even when none of the entity's nine board members were appointed by state officials). A State's appointment power, even if limited, restricts an entity's political independence because it may produce "subtle or indirect manipulation of the entity's decision-making processes" by state officials. Univ. of R.I., 2 F.3d at 1207. Such political pressures are not typically present for political subdivisions like counties and municipalities because States generally do not directly appoint their leaders.

The Retirement Systems' lack of complete political independence and their significant lack of operational independence make it unsurprising that Missouri statutes characterize the Retirement Systems as "state agenc[ies]" and indicate that the Systems are not "political subdivisions." See § 536.010(8) (defining "state agency" as a body that is "authorized by the constitution or statute to make rules or to adjudicate contested cases"); § 169.020(14) (authorizing the Retirement Systems'

Board, subject to the limitations in the statutes creating the Systems, to "formulate and adopt rules and regulations" to administer the Systems). The Supreme Court and the Eighth Circuit have suggested that such characterizations favor a finding that the entity is an arm of a State. Mount Healthy, 429 U.S. at 280; Moor, 411 U.S. at 719; Hadley, 76 F.3d at 1441. Missouri courts also refer to the Retirement Systems' Board as an "agency" and defer to the Board's interpretations of statutes as announced by the rules that the Board promulgates. Savannah R-III Sch. Dist. v. Pub. Sch. Ret. Sys. of Mo., 912 S.W.2d 574, 576–77 (Mo. Ct. App. 1995). These rules are published in the Missouri Code of State Regulations, see Mo. Code Regs. Ann. tit. 16 § 10, which also publishes rules promulgated by other entities that we have held to be arms of the State of Missouri. See, e.g., McLean v. Gordon, 548 F.3d 613, 618 (8th Cir. 2008) (Department of Social Services); Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 890 (8th Cir. 2005) (Department of Corrections); Union Electric v. Mo. Dep't of Conservation, 366 F.3d 655, 660 n.3 (8th Cir. 2004) (Department of Conservation). Thus, Missouri law characterizes the Retirement Systems the way we would expect it to characterize an arm of the State.

Not only does Missouri statutory and case law explicitly indicate that the Retirement Systems lack independence from the State of Missouri, but the nature and scope of the Retirement Systems' operations also imply a lack of independence from the State of Missouri. First, the Retirement Systems do not furnish the type of local services that political subdivisions typically furnish, such as "water service, flood control, [or] rubbish disposal." Moor, 411 U.S. at 719 (noting that a county's provision of these services was an indication of "the independent status occupied by California counties relative to the State of California"); see also Gorman, 257 F.3d at 744 (noting that a police board's "functions are primarily local" in concluding that the board was not an arm of a State). Second, the Retirement Systems' operations are statewide in scope rather than limited to a particular geographic area. McGinty, 251 F.3d at 98 (noting that because a retirement system's operations were statewide in scope, the operations were a function of state government rather than local

government).  Thus, the Retirement Systems appear to be carrying out a function of state government, which implies a lack of independence from the State of Missouri.

On the whole, therefore, the Retirement Systems lack the type of independence from the State of Missouri that a political subdivision typically possesses.  The State of Missouri significantly restricts the Retirement Systems' operational independence, it places material restrictions on the Systems' political independence, and the Systems carry out state-government functions rather than local ones.  Thus, the Retirement Systems do not have "the same kind of independent status" as a political subdivision. Regents, 519 U.S. at 429 n.5.

ii. Whether a Money Judgment in the Retirement Systems'
Favor Could Benefit the State of Missouri's Treasury

Having found that the Retirement Systems possess a relative lack of independence from the State of Missouri, we next consider whether a money judgment in favor of the Retirement Systems could benefit the State of Missouri's treasury.  The Supreme Court has indicated that a money judgment's potential impact upon a State's treasury is of "considerable importance," Regents, 519 U.S. at 430–31, and we generally treat this factor as "more important" than others when determining whether an entity is an arm of a State, Thomas, 447 F.3d at 1084.  If both "legally and practically" a money judgment will have no affect on a State's treasury, then the entity is not an arm of a State.  Hess, 513 U.S. at 51.  The question is one of "potential" benefit, however; whether a money judgment in this particular case will actually benefit the State of Missouri's treasury is not the relevant inquiry.  Regents, 519 U.S. at 431.

A State's role in financing an entity's operation can indicate whether a money judgment in favor of the entity may benefit the State's treasury.  For example, courts have found that an entity is more likely to be an arm of a State if a State makes annual

appropriations to finance the entity's operating expenses or if a State retains custody over the entity's funds.  Hess, 513 U.S. at 45 (noting that a bistate entity received "no money from the States" in concluding that it was not an arm of either of the States that created it); Hadley, 76 F.3d at 1439 (finding that a State's appropriations for part of an entity's annual budget suggested the entity was an arm of the State); McGinty, 251 F.3d at 96–98 (noting that a State retained custody over an entity's funds and provided some revenue to the entity in concluding that the entity was an arm of the State).  In this case, the Retirement Systems are financed by contributions from public-school employees and their employing school districts, not by periodic state appropriations.[4] §§ 169.030(1), .620(1).  Moreover, the Retirement Systems' funds are in the Board's custody and are not to be placed into the Missouri treasury's custody or commingled with the State's funds.  §§ 169.040(1), .610(3).  Thus, the State of Missouri's role in financing the Retirement Systems' operations is restricted.[5]

---

[4] Missouri law provides that the general assembly cannot appropriate funds to "directly or indirectly" finance PSRS.  § 169.110.  Nevertheless, the general assembly may appropriate funds to local school districts who, as employers, make contributions to PSRS, and the general assembly may make payments directly to PSRS on behalf of teachers employed by the state board of education.  Id.  Moreover, we have found no restrictions on the general assembly's power to finance PEERS.  Thus, it would be inaccurate to say that the State of Missouri does not or cannot play *any* role in financing the Retirement Systems' operations.

[5] Despite the separation between the State of Missouri's and the Retirement Systems' coffers, the State of Missouri supervises the Retirement Systems' financial operations to some extent.  State law requires that the Retirement Systems undergo an annual audit, the results of which must be available for public inspection, and the state auditor must review an audit of the Systems at least once every three years and report the results of the review to the governor and the Systems' Board.  § 169.020(16), (22). Additionally, although the Board is authorized to invest the Retirement Systems' funds, statutes place limitations on the Board's investment conduct.  §§ 169.040, .630(2).  The First Circuit has suggested that a State's oversight of an entity's financial operation makes it more likely that the entity is an arm of the State.  Univ. of R.I., 2 F.3d at 1211.

In addition to a State's role in financing an entity's operations, a State's responsibility to pay an entity's obligations may also determine whether a money judgment in favor of an entity could benefit a State's treasury. Regents, 519 U.S. at 430; Moor, 411 U.S. at 719. This is true for at least two reasons even when, as in this case, the relevant entities are plaintiffs who seek a money judgment rather than defendants against whom a money judgment is sought.[6] First, as a practical matter, if a State is responsible to pay the obligations of an entity, an entity's recovery of a money judgment as a plaintiff increases the solvency of the entity, which decreases the potential that the State will have to pay the entity's debts. Cf. Md. Stadium Auth., 407 F.3d at 263–64 (noting the relevance of a State's obligation to finance an entity's annual budget because this obligation would be reduced by the entity's recovery of a money judgment). Second, and more generally, the Supreme Court has noted that a State's responsibility for an entity's debts, apart from its implications for a State's treasury, is an "indicator of the relationship" between the State and the entity. Regents, 519 U.S. at 430–31. Thus, even in litigation where the State would not actually have had to pay a money judgment, the Supreme Court has noted that a State's responsibility for an entity's debts was of "considerable importance." Id. at 430. Therefore, it is appropriate to analyze the extent of the State of Missouri's responsibility to pay the Retirement Systems' obligations.

The portions of the Missouri Revised Statutes which define the Systems' powers and duties do not explicitly provide that the Retirement Systems' debts are the State of Missouri's debts. These statutes also do not implicitly provide that the State of Missouri must pay the Retirement Systems' debts by, for example, providing that the general assembly must appropriate sufficient funds to balance the Retirement Systems' budget for a particular fiscal period. See, e.g., Ernst v. Rising, 427 F.3d 351, 360 (6th Cir. 2005) (statutory requirement); McGinty, 251 F.3d at 99 (constitutional requirement). On the other hand, these statutes do not appear to have vested the

_____

[6] We note that both parties in this case argue that this fact is important, too.

-14-

Retirement Systems or its Board with the power to issue bonds or levy taxes. Such powers generally indicate that an entity can cover its own debts, and the Supreme Court has indicated that an entity's possession of these powers suggests the entity is not an arm of a State. Mount Healthy, 429 U.S. at 280–81; see also Gilliam v. City of Omaha, 524 F.2d 1013, 1015 (8th Cir. 1975) (noting that the City of Omaha's power to "make a levy to pay outstanding judgments against it" showed that the city "would clearly be liable for any judgment rendered against it").

Although the portions of the Missouri Revised Statutes defining the Retirement Systems' powers and duties do not clearly indicate whether the State of Missouri is obligated to pay the Systems' debts, a different portion of the Missouri Revised Statutes suggests the State of Missouri does bear responsibility for certain types of the Systems' debts. Missouri's general assembly appropriates funds to the State Legal Expense Fund ("SLEF"). § 105.711(1). The SLEF makes funds available "for the payment of any claim or any amount required by any final judgment rendered by a court of competent jurisdiction against . . . any agency of the state." § 105.711(2)(1). Generally, we have noted that the Missouri courts have recognized that if an entity is an "agency of the state" for purposes of the SLEF, "judgments obtained against [the entity] would be paid from the state treasury." Thomas, 447 F.3d at 1084 (citing Smith v. Smith, 152 S.W.3d 275, 277 (Mo. 2005)).

Neither party in this case mentions the SLEF, but there is good reason to believe that Missouri law would treat the Retirement Systems as agencies of the state for purposes of the fund. First, the statutes creating the SLEF do not define "agency of the state," but we noted in a prior section of this opinion that part of the Missouri Revised Statutes defines rule-making bodies like the Retirement Systems as "state agenc[ies]," § 536.010(8), and Missouri courts have referred to PSRS as an "agency." Savannah R-III Sch. Dist., 912 S.W.2d at 576–77. Second, the Supreme Court of Missouri found that St. Louis, Missouri's police board was an "agency of the state" for purposes of the SLEF because the board's members were appointed by the governor

-15-

with the senate's consent, because state statutes restricted much of the board's operational independence, and because Missouri courts had historically referred to the board and its actions in ways that indicated that the courts believed the board was a state agency and that its actions were actions of the State. Smith, 152 S.W.3d 277–79. Based on the factors that the Supreme Court of Missouri found relevant in Smith, we believe it is likely that Missouri courts would label the Retirement Systems as "agenc[ies] of the state" for purposes of the SLEF. Thus, it is likely that judgments obtained against the Retirement Systems could be paid from Missouri's treasury through the SLEF. Consequently, a money judgment in favor of the Retirement Systems could benefit the State of Missouri's treasury by increasing the Systems' solvency.

As a final indicator of how a money judgment in favor of the Retirement Systems could benefit the State of Missouri's treasury, we note that Missouri courts have indicated that employees who make contributions to the Retirement Systems have a contractual right to receive retirement benefits. Wehmeier v. Pub. Sch. Ret. Sys. of Mo., 631 S.W.2d 893, 896 (Mo. Ct. App. 1982) ("[T]he Missouri legislature established contractual rights for members of [PSRS] when it created that system." (citing State ex rel. Philip v. Pub. Sch. Ret. Sys. of St. Louis, 262 S.W.2d 569 (Mo. 1953))). Missouri courts have not clearly indicated whether the obligation to perform the contract lies with the State of Missouri, the Retirement Systems, or both entities. See, e.g., Savannah R-III Sch. Dist. v. Pub. Sch. Ret. Sys. of Mo., 950 S.W.2d 854, 857 (Mo. 1997). Missouri courts have indicated, however, that the contractual rights that the Retirement Systems' members possess are the product of a "statutory offer." Wehmeier, 631 S.W.2d at 896. This suggests that the State of Missouri—as the entity who made the statutory offer—is obligated to perform the contract that the offer created.[7] Whether the State of Missouri's treasury must be tapped to perform this

_____

[7] State case law from outside Missouri supports the conclusion that the State of Missouri is contractually obligated to pay retirement benefits to the public-school employees who contribute to the Retirement Systems. See, e.g., Kosa v. Treasurer

obligation depends upon the financial solvency of the Retirement Systems, which is affected by a money judgment in litigation involving the Systems. Thus, for this additional reason, we think it is evident that a money judgment in favor of the Retirement Systems could benefit the State of Missouri's treasury.

## III. Conclusion

In sum, after considering the Retirement Systems' relative lack of independence from the State of Missouri as well as the potential impact that a money judgment in the Systems' favor could have on the State of Missouri's treasury, we find that the State of Missouri is a real party in interest in this case. Thus, we conclude that the Retirement Systems are merely arms of the State of Missouri.[8] As a result, the

_____

of the State of Mich., 292 N.W.2d 452, 461, 465 (Mich. 1980) (noting that the "contractual obligation [is] between public employees and the Legislature"); Weaver v. Evans, 495 P.2d 639, 649 (Wash. 1972) (noting that teachers have a "legislatively promised" contractual right to a retirement benefit); Dadisman v. Moore, 384 S.E.2d 816, 829 (W. Va. 1989) (noting that "[t]he State has a contract with [the retirement system's] members and retirants" and that "statutorily promised pension benefits" create a "general and moral obligation of the State"); see also Valdes v. Cory, 189 Cal. Rptr. 212, 223, 225 (Ct. App. Cal. 1983) (suggesting that both the State and the retirement system are contractually obligated to pay retirants, but noting that "payment of statutorily defined benefits, upon maturity, is a general obligation of the state").

[8] One federal district court has held, on two occasions, that a state-created retirement system for teachers is not an arm of a State. See Accenture LLP v. CSDV-MN Ltd. P'ship, No. 06-CV-1270, 2006 WL 3825029, at *3 (N.D. Ill. Dec. 27, 2006); Travelers Ins. Co. v. Teacher Ret. Sys. of Tex., No. 92 C 6651, 1993 WL 34757, at *2 (N.D. Ill. Feb. 5, 1993). These holdings appear to reflect a minority view, however. See Burrell v. Teacher's Ret. Sys. of Ala., 353 Fed. App'x 182, 183 (11th Cir. 2009) (holding that a state-created retirement system for teachers is an arm of a State); N.M. *ex rel.* Nat'l Educ. Ass'n of N.M. v. Austin Capital Mgmt. Ltd., 671 F. Supp. 2d 1248, 1252–53 (D.N.M. 2009) (same); Turner v. State of Ind. Teachers' Ret. Fund, No. 1:07-cv-1637, 2008 WL 2324114, at *5 (S.D. Ind. June 5, 2008) (same); 21 Properties, Inc. v. Romney, 360 F. Supp. 1322, 1325–26 (N.D. Tex. 1973)

Retirement Systems are not "citizens" for purposes of § 1332(a)(1), which means State Street has failed to prove by a preponderance of the evidence that the district court had original jurisdiction over this case.[9] We therefore affirm the district court's orders to remand this case to state court.

BYE, Circuit Judge, dissenting.

I respectfully dissent. I agree with the majority opinion that 28 U.S.C. § 1447(d) does not prohibit our review of the district court's remand order. I further support the majority's application of our arm-of-the-state factors under the Eleventh Amendment immunity test to determine whether the Retirement Systems are arms of the State of Missouri as they relate to this litigation. However, because my weighing of these factors leads me to conclude the Retirement Systems are citizens for diversity jurisdiction purposes, I would reach the merits of the forum-selection clause question.

---

(same). Indeed, after remanding this case, the district court decided in a separate case that PSRS is an arm of the State of Missouri for purposes of the Eleventh Amendment. Scott v. Pub. Sch. Ret. Sys. of Mo., No. 09-4241, 2010 WL 3749210, at *8 (W.D. Mo. Sept. 21, 2010).

[9] State Street argues that its agreements with the Retirement Systems which are at the center of this dispute contemplated that litigation under the agreements could occur in federal court. Since actions on a contract generally do not arise under federal law, State Street argues that the Retirement Systems "must have anticipated that [they] would be subject to diversity jurisdiction" in federal court. Although it is unclear if State Street is making this argument, to the extent State Street argues that the Retirement Systems have consented to being sued pursuant to § 1332(a)(1), we note that the Eighth Circuit has found such consent to be irrelevant. See, e.g., Cargile v. N.Y. Trust Co., 67 F.2d 585, 589 (8th Cir. 1933).

# I

As an initial matter, the majority acknowledges several characteristics of the Retirement Systems which indisputably weigh in favor of a determination as to the Retirement Systems not being arms of the state: (1) the Retirement Systems are organized as "bod[ies] corporate"; (2) they have the power to sue and be sued in their own name; and (3) they can "transact all of [their] business, invest all of [their] funds, and hold all of [their] cash, securities, and other property." Mo. Rev. Stat. §§ 169.020(1), .610(1). Although these features, standing alone, are not dispositive in the arm-of-the-state inquiry, "the power to sue in the entity's own name, when coupled with other powers of self-determination typically held by distinct juridical entities (power to contract, power to buy, hold, and sell property), undeniably affords the entity some additional independence from the State . . . ." Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1207 n.11 (1st Cir. 1993); see also Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 243-44 (2d Cir. 2006) (concluding the identification of the entities as "bod[ies] corporate" weighed against a finding as to the specific entity being an arm of the state). Accordingly, I remain unpersuaded by the majority's attempt to minimize these characteristics in lieu of its enhanced focus on the Retirement Systems' purpose and manner of carrying out such purpose. See Moor v. Alameda County, 411 U.S. 693, 719 (1973) (stating the "most notabl[e]" factor was that the county was given "corporate powers" and was designated a "body corporate and politic").

Moreover, the additional regulations cited by the majority do not necessarily support its conclusion. For instance, the majority places emphasis on Missouri's regulation of the Retirement Systems' source of revenue and financial operations, notwithstanding the fact these same statutes expressly prohibit the State from appropriating funds "directly or indirectly" to finance the Retirement Systems, and declare the funds of the Retirement Systems "to be the moneys and funds of the

retirement system" which "shall not be commingled with state funds," as will be discussed more fully below. Mo. Rev. Stat. §§ 169.110, .040(1), .610(3).

In addition to their operational independence, the Retirement Systems enjoy significant political autonomy from the State. First, the Governor appoints only a minority of Board positions, none of whom can be state employees or elected officials. Mo. Rev. Stat. §§ 169.020(2), .020(4). Under these restrictions, the Retirement Systems are provided more autonomy than those systems where a governor appoints a majority of the board or otherwise retains control, although even the latter situation does not necessarily dictate an entity is an arm of the state. See Auer v. Robbins, 519 U.S. 452, 456 n.1 (1997) ("While the Governor appoints four of the board's five members, . . . the city of St. Louis is responsible for the board's financial liabilities, . . . and the board is not subject to the State's direction or control in any other respect. It is therefore not an 'arm of the State' . . . ."). Moreover, the Board is empowered to select staff positions and control its own funds, among other tasks. Mo. Rev. Stat. §§ 169.020(10), .020(11), .020(20)., .040(1), .040(2). While there are certainly aspects which detract from the Retirement Systems' independence, such as their limited scope of services, these aspects do not necessarily result in a determination that the Retirement Systems are an arm of the State.

What remains is the question of whether the Retirement Systems are liable for money judgments against them or, conversely, whether the State would benefit from a judgment in favor of the Retirement Systems. This is widely considered to be the most important factor in the arm-of-the-state analysis. See Regents of Univ. of Cal. v. Doe, 519 U.S. 425, 430 (1997) ("Of course, the question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued."); Thomas v. St. Louis Bd. of Police Comm'rs, 447 F.3d 1082, 1084 (8th Cir. 2006) ("[C]ourts assess the agency's degree of autonomy and control over its own affairs and, *more importantly*, whether a money

judgment against the agency will be paid with state funds.") (emphasis added); <u>Hadley v. N. Ark. Cmty. Technical Coll.</u>, 76 F.3d 1437, 1439 (8th Cir. 1996) ("A narrow majority of the Supreme Court recently held that exposure of the state treasury is a more important factor than whether the State controls the entity in question.") (citing <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 48 (1994)).

In this case, as State Street argues, a judgment in favor of the Retirement Systems cannot flow to the State because Missouri statutes insulate the entities' accounts from those of the State. The Retirement Systems are contributory retirement plans which receive their funds from local school districts and their employees, not by legislative appropriation. Indeed, by the explicit language contained in the Missouri statute, the State is prohibited from "directly or indirectly" contributing funds to the Retirement Systems. Mo. Rev. Stat. § 169.110. Moreover, the Retirement Systems' funds are "deemed to be the moneys and funds of the retirement system and not revenue collected or moneys received by the state." Mo. Rev. Stat. § 169.040(1). To further ensure this separation, the Missouri statute forbids the commingling of funds between the Retirement Systems and the State. <u>Id.</u> Similarly, the Retirement Systems' costs "shall be paid from funds of the system," rather than by legislative appropriation. Mo. Rev. Stat. § 169.020(19). In view of the Retirement Systems' exclusive and extensive control of their funds, any potential recovery by the Retirement Systems in this case is not likely to inure to the benefit of the State.

The majority concedes, as it must, the extensive statutory restrictions set forth above precluding the State's control over the Retirement Systems' financial affairs. Nevertheless, the majority proceeds to navigate around the statutes' express directives by emphasizing what is *not* present in the statutes, such as the absence of an express power of the Retirement Systems to issue bonds or levy taxes, which may be indicative of an entity which is not an arm of the state. What's more, the majority relies heavily on the hypothetical likelihood as to Missouri courts being able to label the Retirement Systems as agencies of the State, and, hypothetically, the State Legal

Expense Fund (SLEF) could thereafter make funds available for the payment of any claim against the alleged agencies.[10] The majority also finds support for its determination in the liability the State might incur pursuant to its hypothetical contractual obligations to employees who contribute to the Retirement Systems. Although I disagree with the majority's analysis regarding both the SLEF and the contractual performance issue – both of which were never raised by either party – I believe we need to look no further than the express language of Missouri's statutes to conclude the financial factor weighs in favor of State Street. In sum, although the majority correctly notes the question is one of "potential" benefit, see Doe, 519 U.S. at 431, the majority's analysis effectively turns a blind eye to the explicit statutory language in lieu of its hypothetical assessments that border on contradicting those very statutes.

Under the explicit statutory language, I believe the Retirement Systems are similar to other retirement systems held not to be arms of the state, largely due to their fiscal autonomy and the lack of an obligation on the state's part to pay the systems' debts. See, e.g., Blake v. Kline, 612 F.2d 718, 723-24 (3d Cir. 1979) (vacating and remanding the district court's holding of Eleventh Amendment immunity where the Public School Employees' Retirement Board of Pennsylvania funds were set apart and

_____

[10]The majority's sole authority for its proposition that Missouri courts have referred to the Retirement Systems as state agencies is Savannah R-III School District v. Public School Retirement System of Missouri., 912 S.W.2d 574, 575 (Mo. Ct. App. 1995), a per curiam opinion involving a dispute about whether the salary rate of Public School Retirement System members includes fringe benefits. The question of whether the Retirement System was a state agency was never discussed in Savannah, and the issue was only peripherally referenced by the court in deciding whether to accord the Retirement System deference in its interpretation of a state statute concerning salary rates. 912 S.W.2d at 576-77. Therefore, whatever can be gleaned from Savannah has very little, if any, application to the instant question of whether the Retirement Systems are arms of the State, particularly in light of the express statutory language discussed above providing the Retirement Systems with independence from the State in their operations.

not to be commingled with state funds and it was not clear whether the system performed a proprietary or governmental function or how much autonomy the system maintained); Roche v. Lincoln Prop. Co., 175 Fed. Appx. 597, 601 (4th Cir. 2006) (holding a judgment against a retirement investment fund whose expenses were assessed solely against the fund, and not the state treasury, would not affect the state, and therefore the fund was not an arm of the state); Rivera-Torres v. Sistema de Para Maestros, Inc., 453 F. Supp. 2d 383, 386-87 (D.P.R. 2006) (holding the retirement system was not an arm of the state because it could sue and be sued, prepare its own budget, and all debts and obligations were the responsibility of the system itself); Accenture LLP v. CSDV-MN Ltd. P'ship, No. 06-CV-1270, 2006 WL 3825029, at *2-3 (N.D. Ill. Dec. 27, 2006) (determining the California Teachers Retirement System was not an arm of the state because it was not publicly financed; it was funded through contributions from employers, members, and the state; it maintained the power to sue, contract, and own property; and the appointment of some members of the Board by the governor did not amount to control by the state); Travelers Ins. Co. v. Teacher Ret. Sys. of Texas, No. 92 C 6651, 1993 WL 34757, at *3-5 (N.D. Ill. Feb. 5, 1993) (concluding the Teacher Retirement System of Texas was not an alter ego of the state where, despite contributions from the state to the system, the judgment would not increase the obligations to the state treasury, and therefore, would not amount to a judgment against the State); Almond v. Boyles, 612 F. Supp. 223, 228 (E.D.N.C. 1985), aff'd in part, vacated in part, 792 F.2d 451 (4th Cir. 1986) (holding the retirement system was not an arm of the state where the legislature did not appropriate a substantial portion of money held by the system and a judgment against the system would not lead to an additional appropriation of state funds).

Although it recognizes two of these cases, the majority believes these holdings "reflect a minority view." Likewise, the Retirement Systems center their entire argument around the "virtually unanimous federal court authority" finding retirement systems to be arms of the state. I am not persuaded by the "majority" of cases for at least two reasons. First, "[w]hile several courts have examined the instant question

of whether a state retirement system is the alter ego of the state, they are divided on the issue." Travelers Ins. Co., 1993 WL 34757, at *2. At a minimum, the Retirement Systems' suggestion as to there being "virtually unanimous federal court authority" appears to be flatly wrong, as demonstrated by a review of the case law cited above holding otherwise.

More importantly, however, even if there is such unanimous authority, the Retirement Systems' cursory recitation of a "majority" view does not suffice in this case, given the inquiry we must undertake. Under our arm-of-the-state inquiry, "the court must examine the particular entity in question and its powers and characteristics as created by state law . . . ." Greenwood v. Ross, 778 F.2d 448, 453 (8th Cir. 1985) (internal quotation marks and citation omitted). As a result, the Retirement Systems' proclamation as to there being near "unanimous" authority on their side provides little support in the context of Missouri's statutory scheme.

Indeed, upon closer analysis of the decisions cited by the Retirement Systems, it becomes strikingly clear that those systems were set up far differently than here, primarily in the area of financial and political control by the state. See Ernst v. Rising, 427 F.3d 351, 359-60 (6th Cir. 2005) (holding Michigan's retirement system for state-court judges was an arm of the state because the state would be liable for any judgment against the system, the state had "extensive and detailed control over the retirement system," a majority of board members were appointed by the governor, and the system's operations had more in common with a traditional state function than a local one); McGinty v. New York, 251 F.3d 84, 97, 99-100 (2d Cir. 2001) (concluding Eleventh Amendment immunity existed where the state made significant payments each year to the retirement system and the state would become responsible for judgments against the system); Fitzpatrick v. Bitzer, 519 F.2d 559, 565 (2d Cir. 1975), rev'd on other grounds, 427 U.S. 445 (1976) (determining the retirement fund was an arm of the state where the state was required to appropriate funds annually and pay retirement income payments, and thus a judgment against the fund would

automatically increase the obligations of the state treasury); W. Va. Inv. Mgmt. Bd. v. Residential Accredited Loans, Inc., No. 2:10-cv-461, 2010 WL 3418314, at *2-4 (S.D.W.Va. Aug. 26, 2010) (finding the investment board was an arm of the state where its funds were transmitted through the state and the board was composed of state officials and ten members appointed by the governor); Mo. State Employees' Ret. Sys. v. Credit Suisse, N.Y. Branch, No. 09-4224-CV-C-NKL, 2010 WL 318652, at *6 (W.D.Mo. Jan. 21, 2010) (concluding the Missouri State Employees' Retirement System was an arm of the state where the state was statutorily obligated to contribute to the system's budget and the majority of the board was comprised of state officials); N.M. ex rel. Nat'l Educ. Ass'n of N.M., Inc. v. Austin Capital Mgmt. Ltd., 671 F. Supp. 2d 1248, 1253 (D.N.M. 2009) (considering an educational retirement board to be an arm of the state where it was composed primarily of state officials or those appointed by the governor and the state treasurer was the custodian of the fund, with disbursements from the fund made through the state); Cal. Pub. Employees Ret. Sys. v. Moody's Corp., Nos. C 09-03628 SI, C 09-03629 JCS, 2009 WL 3809816, at *3 (N.D. Cal. Nov. 10, 2009) (determining a retirement fund was an arm of the state where the state had substantial fiscal obligations to the fund, including an obligation to contribute annually to the fund and pay any shortfall in its funding); Turner v. State of Ind. Teachers' Ret. Fund, No. 1:07-cv-1637-DFH-JMS, 2008 WL 2324114, at *3 (S.D. Ind. June 5, 2008) (concluding a retirement fund was an arm of the state where the state assembly allocated money to the retirement fund on an annual basis and the state bore the ultimate responsibility for maintaining sufficient money in the fund to cover the state's liability to its members); JMB Group Trust IV v. Penn. Mun. Ret. Sys., 986 F. Supp. 534, 537-38 (N.D. Ill. 1997) (determining the retirement system was an arm of the state where all board members were state officials or were appointed by the governor, and thus declining to reach the financial considerations); Kan. Pub. Employees Ret. Sys. v. Boatmen's First Nat'l Bank of Kansas City, 982 F. Supp. 806, 808-09 (D. Kan. 1997) (finding the retirement system was not autonomous, in part, because all board members were appointed by the governor and the state treasurer retained custody of its funds, and the state would benefit from a

judgment in favor of the system in light of the Kansas Supreme Court's determination that a recovery would benefit the state); Hair v. Tenn. Consol. Ret. Sys., 790 F. Supp. 1358, 1361, 1364 (M.D. Tenn. 1992) (stating "[a]s with . . . other cases, the determination in the instant case comes down to whether a judgment would come from the funds of the [retirement system] or would require a special appropriation from the General Assembly," and concluding the state would be liable); Mello v. Woodhouse, 755 F. Supp. 923, 926 (D. Nev. 1991) ("In this case a decree against defendants would operate against Nevada because forcing defendants to perform under the contract would require Nevada to expend money from its state treasury. Thus, in this case, the suit is, in effect, a suit against Nevada."); 21 Props., Inc. v. Romney, 360 F. Supp. 1322, 1326 (N.D. Tex. 1973) (holding the retirement system was an alter ego of the state where any money judgment rendered against the system would have to be satisfied out of public money, which would directly affect the state treasury).

In sum, contrary to supporting their argument, these decisions actually favor the determination that the Retirement Systems are not arms of the State because Missouri's statutory scheme unquestionably provides the Retirement Systems with far more independence than those systems cited above. See Scott v. Pub. Sch. Ret. Sys. of Mo., No. 09-4241, 2010 WL 3749210, at *6 (W.D. Mo. Sept. 21, 2010) ("PSRS is more autonomous than most public retirement systems."). Looking at the factors as a whole, I agree with State Street that PSRS enjoys broad legal, fiscal, and operational autonomy separate and part from the State, and thus it is not an arm of the State. Accordingly, I would conclude the Retirement Systems are citizens for diversity jurisdiction purposes.

## II

Because I would conclude the Retirement Systems are not arms of the State, and therefore are citizens for diversity jurisdiction purposes, I would reach the merits of the forum-selection clause question.

_____